**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SILK TITLE HOLDINGS LLC, SILK TITLE & ESCROW, LLC,<br>Plaintiffs,<br><br>v.<br><br>FIFTH THIRD BANK, NATIONAL ASSOCIATION,<br>Defendant. | C.A. No. 1:23-cv-00529-MSM-AEM |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION,<br>Counterclaim Plaintiff,<br><br>v.<br><br>SILK TITLE HOLDINGS LLC, *et al.*,<br>Counterclaim Defendants. | |

**MEMORANDUM AND ORDER**

Mary S. McElroy, United States District Judge.

This case centers on a dispute over two payments, totaling $1.5 million (the "Challenged Payments"), that the plaintiffs, Silk Title Holdings LLC and Silk Title & Escrow, LLC (together, "Silk Title"), received from the defendant, Fifth Third Bank, National Association ("Fifth Third"), in 2023. Silk Title contends that it is entitled to retain the Challenged Payments and claims Fifth Third improperly terminated the parties' treasury management relationship. Fifth Third alleges that the Challenged

Payments were facilitated by a rogue employee, and it asserts related counterclaims against Silk Title and its guarantors, other Silk Title LLCs.

Before the Court are Silk Title's Motion for Partial Summary Judgment (ECF No. 98) and Fifth Third's Motion for Summary Judgment (ECF No. 100). For the following reasons, the Court DENIES Silk Title's Motion and GRANTS Fifth Third's Motion.

## I. BACKGROUND

The parties do not dispute the general sequence of events, summarized as follows, that led to the Challenged Payments by Fifth Third to Silk Title.

Fifth Third is a national banking association based in Cincinnati, Ohio. Silk Title provides title insurance and other real estate services and has its principal place of business in Warwick, Rhode Island. In 2022, Silk Title and Fifth Third began a treasury management relationship, under which Silk Title was to transfer its banking relationship to Fifth Third. Silk Title opened its first account with Fifth Third in March 2022. In April 2022, Fifth Third also extended a line of credit for $1 million to Silk Title. This line of credit was to mature on July 4, 2023, at which point it would be immediately due to Fifth Third.

Around that same time, Fifth Third began rolling out a "placement fee/client compensation program" intended—at least in part—to incentivize new clients. The parties disagree on the nuances of this program. According to Fifth Third, the program entailed only three kinds of "treasury management incentives" that were tied to net deposits in accounts at Fifth Third and were subject to careful oversight

by Fifth Third officers. (ECF No. 100 at 5–7.) Silk Title, on the other hand, characterizes the program as involving a greater degree of discretion on the part of Fifth Third officers, who were empowered to approve compensation for certain clients without written agreements. (ECF No. 98 at 4–5.)

Following the departure of another official involved in onboarding Silk Title as a client, Larry Chapman, a treasury management officer at Fifth Third, took over managing the bank's relationship with Silk Title on his own. In May 2023, Mr. Chapman, through emails with Silk Title's principals—including its CEO, Marc Trachtenberg—began discussing a renewal of Silk Title's $1 million line of credit. These discussions included requests for financial information from Silk Title, including projections for income and total additional monthly deposits once it transferred its accounts to Fifth Third.

Based on the projections provided by Silk Title—which Fifth Third now contends were wildly overestimated, *see* ECF No. 100 at 8–9—Mr. Chapman began working on a possible placement fee for Silk Title. He ultimately secured internal bank approval of Silk Title being slated for a 3.25% placement fee "rate" based on Silk Title's projected deposits with Fifth Third. Neither party contends that the Challenged Payments were made pursuant to this placement fee rate.

On July 7, 2023, Wells Fargo Bank, N.A. ("Wells Fargo") declined to renew its own $500,000 line of credit to Silk Title based on Silk Title's "declining profit trend."

*See* Fifth Third MSJ Supporting Attach., at Footnote 61.[1] Between July 7 and August 1, Mr. Trachtenberg repeatedly texted Mr. Chapman about whether Fifth Third would renew its $1 million line of credit with Silk Title, which at that point had come due. *Id.* at Footnotes 63, 64. Apparently in response, on August 1, 2023, Mr. Chapman began describing a "crazy idea" to extend an interest-free "fake LOC" to Silk Title, to which Mr. Trachtenberg responded, "This is perfect." *Id.* at Footnote 67.

The "fake LOC" never materialized, apparently in part due to internal pushback at Fifth Third. *See id.* at Footnote 71. Instead, in text messages during the following weeks, Mr. Trachtenberg and Mr. Chapman began discussing a $500,000 "deposit" to be made by Fifth Third to Silk Title. *Id.* at Footnote 74. The text messages did not explain the circumstances or reason for this prospective deposit. The Court concludes that Mr. Trachtenberg and Mr. Chapman must have discussed it elsewhere. No evidence suggests that any other Fifth Third employees were involved in that discussion. In a text message on August 7, Mr. Trachtenberg asked Mr. Chapman to "[t]ell them to make it for the 15th since that's my birthday." *Id.*

On August 16, 2023, Mr. Chapman emailed Fifth Third's Customer Support Center team with the subject line "Silk Title Placement Fee – July." *Id.* at Footnote 77. In that email, Mr. Chapman stated that the usual Fifth Third officer who would

[1] Fifth Third submitted its exhibits in support of its Motion for Summary Judgment in the form of a single PDF that is organized according to the chronological order of its Motion's citations, which are all contained in footnotes. The Court's citations are to the exhibits that correspond with each footnote.

submit placement fee requests was out of the office and that Mr. Chapman—who was usually the approver of such fees—was stepping in for her. *Id.* Attached to that email was a "placement fee support spreadsheet" with a "Post Deposit Placement Fee" slip filled out for $500,000. *Id.* at Footnote 79. Absent from the email was a "placement fee support calculation sheet" that would have provided a more concrete justification for the prospective placement fee. *See id.*

One of Mr. Chapman's subordinates processed the request and disbursed the $500,000 to Silk Title. *Id.* at Footnote 80. This was the first of the two Challenged Payments at issue here. The next day, Silk Title wired $495,000 to Wells Fargo to pay off the outstanding balance of its loan there. *Id.* at Footnote 81. Mr. Trachtenberg subsequently thanked Mr. Chapman via text messages, in response to which Mr. Chapman texted "Remember this is our secret ha count that as revenue as well! Ha." *Id.* at Footnote 83.

Following this first payment, Mr. Chapman and Mr. Trachtenberg again began repeatedly texting each other regarding Fifth Third's pending decision whether to renew its $1 million line of credit to Silk Title, which was extended to October 3, 2023. *Id.* at Footnote 91. During this time, Fifth Third officers overseeing the line of credit began communicating their concerns regarding the loan to Mr. Chapman. The concerns were based largely on the failure of Silk Title to provide all the financial information Fifth Third had requested from it. *Id.* at Footnotes 99, 102. Mr. Chapman's responses to these concerns included a reference to the Wells Fargo loan, stating that "For a client to pay off his RLOC in full and close it-should tell us the

turnaround story itself." *Id.* at Footnote 102. Mr. Chapman appears to have omitted the fact that the Wells Fargo loan was apparently paid off with the very funds he ensured were disbursed to Silk Title from Fifth Third.

In his text messages to Mr. Trachtenberg throughout September and October 2023, Mr. Chapman repeatedly updated him on his efforts to assuage Fifth Third's credit team's concerns regarding Silk Title's financial transparency about the $1 million line of credit. *Id.* at Footnote 91. On October 12, 2023, as those concerns continued to escalate, Mr. Trachtenberg submitted a "Personal Financial Statement" to Fifth Third that contained a written certification that it was "complete, correct and not misleading" and that Fifth Third could rely upon it as such. *Id.* at Footnote 107. Despite this written certification, Mr. Trachtenberg informed Mr. Chapman via text message that the statement instead contained only "estimates and roundabouts." *Id.*

On October 17, Mr. Chapman texted Mr. Trachtenberg to give him a call when he was "free in and [sic] private," as he had "[g]ood news." *Id.* at Footnote 64. After an 8:00 p.m. phone call that night, Mr. Trachtenberg texted Mr. Chapman, "You are absolutely the best man! I can't thank you enough." *Id.* In a text message on October 21, Mr. Trachtenberg asked Mr. Chapman, "Am I paying the LOC off this week?" *Id.* at Footnote 112. According to Mr. Trachtenberg, Mr. Chapman had told him during that phone call that Silk Title would be receiving "a $ 1 million placement fee credit or a placement fee . . . for moving [its] business over" and that the placement fee should be used to pay off the line of credit. *See* Silk Title, MPSJ Exhibit RR.

In the hours following the October 17 phone call with Mr. Trachtenberg, Mr. Chapman circulated an email to Fifth Third "finance" and "product" officers tasked with approving placement fee payments before those fees were processed by the Customer Support Center team. (Fifth Third MSJ Supporting Attach., at Footnote 127.) This email, bearing the subject line "September Mortgage & Title Placement Fees," was forwarded by the product officer with attached spreadsheets for four other Fifth Third clients, but not for Silk Title. *Id.* The finance officer approved "payments for the Placement Fees attached for MWL clients" through Microsoft Outlook's "voting button" function. *Id.* at Footnote 133. Following that approval, the products officer forwarded Mr. Chapman an email stating that "Product and Finance [attached] approve Sept 2023 placement fees for the following clients…" and listing the four clients attached in the initial email. *Id.* at Footnote 135.

The next day, Mr. Chapman emailed the Customer Support Center mailbox with the same subject line: "September Mortgage and Title Placement Fees." *Id.* at Footnote 136. The body of that email read "Hello Team, Please see the attached for September Placement Fees with My approval (this e-mail) along with Product/Finance." *Id.* Mr. Chapman, however, did not forward or attach the email containing the enumerated list of clients approved by both the finance and product officers; instead, he only forwarded the "voting button" approval email that approved "the attached" clients. *See id.* Mr. Chapman's email to the Customer Support Center included a placement fee spreadsheet for Silk Title, which had *not* been reviewed or approved by the product and finance officers, and which—as with the $500,000

payment—lacked any supporting calculations. *See id.* The proposed payment for Silk Title was exactly $ 1 million—the same amount as its outstanding loan from Fifth Third. *Id.* at Footnote 144.

Apparently unaware of Mr. Chapman's email machinations, the Customer Support Center approved the payment to Silk Title, which was disbursed on October 25, 2023. *See id.* at Footnote 146. Mr. Trachtenberg then swiftly paid off Silk Title's $1 million loan from Fifth Third with the $1 million payment. *Id.* at Footnote 148. He did so after consulting with Mr. Chapman regarding how to communicate the request to Fifth Third to use the placement fee from Fifth Third to pay off its own loan to Silk Title. *Id.* at Footnote 147.

In early November 2023, Fifth Third discovered what had happened, reversed the $1 million payoff of the line of credit, and terminated Mr. Chapman's employment. Fifth Third subsequently demanded immediate repayment of the $1.5 million paid to Silk Title and requested Silk Title to sever its banking relationship with Fifth Third. *Id.* at Footnote 166; Silk Title, MPSJ Exhibit CC. In response, Silk Title filed suit, alleging claims for breach of contract (Count I), breach of implied-in-fact contract (Count II), promissory estoppel (Count III), and negligent misrepresentation (Count IV). *See* ECF No. 12 (Second Amended Complaint). Fifth Third counterclaimed against Silk Title, alleging claims related to Silk Title's failure to repay the $1 million loan, its retention of the earlier $500,000 payment, and its failure to pay other overdraft and credit card fees. (ECF No. 19.)

## II. STANDARD OF REVIEW

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (quoting Adv. Comm. Notes to Fed. R. Civ. P. 56). Summary judgment can be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant's motion for summary judgment is properly supported by evidence, the burden shifts to the non-moving party to present enough evidence to establish that there are genuine disputes over material facts. *ATC Realty, LLC v. Town of Kingston, N.H.*, 303 F.3d 91, 94 (1st Cir. 2002). A dispute is genuine if a reasonable jury could, based on the evidence presented by the parties, resolve it in favor of the non-moving party. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). A material fact affects the outcome of the suit. *Id.*

In ruling on a motion for summary judgment, the Court must examine the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996)). When parties cross-move for summary judgment, the Court evaluates each motion separately using this standard. *Vazquez-Velazquez v. P.R. Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023). The

Court may not choose between plausible but conflicting inferences on a pivotal issue in the case. *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995).

## III. DISCUSSION

Silk Title vigorously disputes any characterization of the Challenged Payments as being unauthorized. (ECF No. 98.) Instead, while acknowledging that the nature of those payments differed from many other placement fees paid by Fifth Third, Silk Title contends that the Challenged Payments were "incentive payments," which Mr. Chapman was empowered to authorize on an "exception basis" without any written agreement. *Id.* at 4–5. Silk Title's core argument is thus that Mr. Chapman had either implied or apparent authority to bind Fifth Third to those payments, and that Fifth Third's attempt to claw them back is improper. *Id.* at 12–37.

Fifth Third, in turn, contends that Mr. Chapman lacked any implied or apparent authority to enter any agreement with Silk Title for the Challenged Payments. (ECF Nos. 100 at 34–36; 103 at 4–25.) But it also rejects the premise behind Silk Title's position, that *any* agreement or contract regarding the Challenged Payment ever materialized. (ECF No. 100 at 27–33.) According to Fifth Third, the essential elements of a contract, most notably mutuality of agreement and mutuality of obligation, are lacking here. *Id.* Absent any contract, Mr. Chapman's authority to act on Fifth Third's behalf in arranging those payments would be irrelevant. *Id.*

At the outset, the Challenged Payments fall outside the scope of the treasury management agreement between the parties, which was governed by a "Master

Treasury Management Agreement" and three other written contracts, collectively forming the "Operative Agreements." (ECF Nos. 19-11 through 19-14.) Those contracts provided the "complete and exclusive statement of the agreement between the parties" regarding their treasury management relationship. (ECF No. 19-11 at 11.) Neither party appears to allege that the Challenged Payments constituted a modification to the Operative Agreements, or that they were otherwise made under some provision of those contracts.

Instead, in its Second Amended Complaint, Silk Title alleges that the agreement Mr. Trachtenberg reached with Mr. Chapman was that Mr. Chapman would arrange the Challenged Payments in exchange for Silk Title committing to transferring its entire banking relationship from Wells Fargo to Fifth Third. (ECF No. 12 ¶¶ 22–23, 37–38.) Although Silk Title at times suggests that this agreement was formed through Mr. Trachtenberg's acceptance of an offer extended by Mr. Chapman, none of the evidence it cites in support of this suggestion indicates that any such express agreement was ever reached. Silk Title's own briefing otherwise argues that the supposed arrangement constituted an implied-in-fact contract, rather than a written or oral express contract. *See* ECF Nos. 99 ¶¶ 38–45, 71–78 (describing the alleged offer and acceptance); 106 at 6–12 (arguing that the parties' conduct demonstrated an implied-in-fact contract). Thus, the threshold question at summary judgment is whether this implied-in-fact contract existed.

The parties appear to agree that, should the Challenged Payments fall outside the Operative Agreements (which are themselves governed by Ohio law), any dispute

over the payments should be resolved by application of Rhode Island law. *See* ECF Nos. 98 at 10–12; 100 at 27–33, 44–45. The Court concurs. Federal courts apply the substantive law of the forum state (here, Rhode Island) when analyzing choice-of-law issues for state-law claims. *Smith v. Prudential Ins. Co. of Am.*, 88 F.4th 40, 49 (1st Cir. 2023). For contract cases, the Rhode Island Supreme Court "has not adopted a definitive analysis" for determining which law applies absent a choice of law clause, but it has generally employed an "interest-weighing approach" in which it applies the law of the state that bears "the most significant relationship to the event and the parties." *Webster Bank, Natl. Assn. v. Rosenbaum*, 268 A.3d 556, 560 (R.I. 2022). Rhode Island bears the most significant relationship to the Challenged Payments because those payments were supposedly agreed to by the parties and received by Silk Title in the state, which is where Silk Title is itself located.

Under Rhode Island law, a contract is "an agreement which creates an obligation," and requires "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *Rhode Island Five v. Medical Associates of Bristol County, Inc.*, 668 A.2d 1250, 1253 (R.I. 1996). Although factual findings are relevant, whether a contract exists is a question of law the Court must resolve. *Coccoli v. Town of Scituate Town Council*, 184 A.3d 1113, 1118 (R.I. 2018). To prevail on a breach of contract claim, a plaintiff must prove that the contract existed, that it was breached, and that the defendant's breach caused the plaintiff damages. *Fogarty v. Palumbo*, 163 A.3d 526, 541 (R.I. 2017).

There are, broadly speaking, two types of contracts. An express contract is one in which the parties agree to the terms and conditions of the contract either orally or in writing. *Haviland v. Simmons*, 45 A.3d 1246, 1258 (R.I. 2012). An implied-in-fact contract, on the other hand, is "a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document." *Marshall Contractors, Inc. v. Brown Univ.*, 692 A.2d 665, 669 (R.I. 1997).

Express contracts and implied-in-fact contracts differ only by the means through which the parties express mutual assent. *Id.* To be enforceable, an implied-in-fact contract "must contain all [of] the elements of an express contract," including "mutual agreement, and intent to promise, but the agreement and the promise have not been made in words and are implied from the facts." *Bailey v. West*, 249 A.2d 414, 416 (R.I. 1969). To determine whether these elements are present, Rhode Island courts consider the parties' conduct, actions, and correspondence. *Cote v. Aiello*, 148 A.3d 537, 545 (R.I. 2016).

In *Burt v. Board of Trustees of the Univ. of Rhode Island*, 84 F.4th 42 (1st Cir. 2023), the First Circuit applied Rhode Island law to determine that a pair of students had plausibly alleged an implied-in-fact contract between themselves and the University of Rhode Island ("URI") for in-person instruction. That case emerged out of the COVID-19 pandemic, during which URI implemented remote classes and limited access to on-campus facilities. *Id.* at 48. The plaintiff students argued that,

although no written contract between them and URI guaranteed in-person instruction in exchange for their tuition payments, this was implied by URI's past practice. *Id.* at 51-52. The First Circuit agreed, finding that URI's history of in-person instruction, its promotional materials, and the plaintiffs' prior enrollment in on-campus classes all supported a reasonable inference that an implied-in-fact contract for in-person instruction in exchange for tuition payments could have existed between the plaintiffs and URI. *Id.* at 52–53.

When the course of the parties' conduct demonstrates a lack of any mutual understanding of and consent to the terms of an agreement, however, no implied-in-fact contract is formed. *See Marshall Contractors, Inc. v. Brown U.*, 692 A.2d 665, 670 (R.I. 1997). In *Marshall Contractors*, a construction contractor sought recovery for the cost of construction work furnished during the construction of a sports facility for Brown University that it believed was not originally included in the scope of the project. *Id.* at 667. Brown contended that, notwithstanding the parties' continued disagreement over that scope and the lack of any finalized written contract, the course of the parties' conduct—most notably, the contractor's completion of the project—supported a finding that implied-in-fact contract existed, under which the construction contractor was only entitled to a sum that the parties had previously discussed. *Id.* The trial court agreed. *Id.* at 668.

The Rhode Island Supreme Court reversed. *Id.* at 671. As it explained, "[t]he inability of the parties to ever reach mutual agreement on what the scope of the project was intended to include certainly constituted the very heart and vital essence

of their ongoing contract negotiations and prevented the emergence and the existence of any implied in fact contract." *Id.* at 699. It further noted that "[i]t is inconceivable that the parties, experienced as they were in their respective roles, would ever bind themselves to a project of such enormity and cost, without first agreeing upon what Marshall was to build in return for Brown's $7,157,051." *Id.* at 670. Thus, given the lack of any concrete understanding between the parties as to the core terms of their supposed agreement, no implied-in-fact contract existed. *Id.* at 670–71.

A lack of mutuality of obligation will also prevent the formation of an implied-in-fact contract. *Cote*, 148 A.3d at 546; *see Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1341 (R.I. 1996) ("It is a fundamental principle of contract law that a bilateral contract requires mutuality of obligation. This mutuality is achieved when both parties are 'legally bound through the making of reciprocal promises.'") (quoting *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir. 1994)) (internal citations omitted). In *Cote v. Aiello*, the plaintiff sued the defendants based on their failure to honor their promises that, if the plaintiff worked for one of their companies, the plaintiff could have the opportunity to purchase that company. 148 A.3d at 540. No written contract formalized these promises, which were made over the course of conversations with the plaintiff spanning several years, and no details or terms of any prospective purchase were ever discussed. *Id.* at 541.

The Rhode Island Supreme Court affirmed the trial court's determination that no implied-in-fact contract existed between the parties, noting that the trial court "emphasized that plaintiff did not consider himself bound to an agreement to

purchase and that he could negotiate or decline to go forward were an offer to purchase presented to him." *Id.* at 546. Because when "a party intends that his agreement to terms of a contract will have no legal consequences . . . there is no intent to be bound," the plaintiff's lack of commitment to any purchase agreement (along with the lack of any other evidence indicating agreement on essential terms) doomed his implied-in-fact contract claims. *Id.* (quoting *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989)).

The supposed implied-in-fact contract here shares similar flaws to those addressed in *Marshall Contractors* and *Cote*. First, the course of the parties' conduct suggests a lack of any mutual understanding of the terms of the agreement that Silk Title proposes. The only evidence that Silk Title cites in support of its position as to those terms, apart from the facts recounted above, is deposition testimony from Mr. Trachtenberg in which he stated his opinion regarding the scope of the agreement. *See, e.g.*, Silk Title, Resp. to Fifth Third MSJ Exhibit RR. But even construed in the light most favorable to Silk Title, Mr. Trachtenberg's opinion—if it could be said to demonstrate *Fifth Third's* understanding of the agreement—is extraordinarily vague as to the specific terms of supposed implied-in-fact contract. At best, Mr. Trachtenberg's testimony proposes that the Challenged Payments were intended to encourage Silk Title to transfer some or all of its deposits to Fifth Third, something that Silk Title was already in the process of doing. Absent from his testimony, however, is an indication as to any other terms that one would expect as a part of a business contract, such as the particular amount of deposits that were to be

transferred or the timeframe. As in *Marshall Contractors*, "[i]t is inconceivable that the parties, experienced as they were in their respective roles, would ever bind themselves" to this kind of arrangement without first agreeing on these terms. 692 A.2d at 670.

Second, the parties lacked mutuality of obligation regarding the supposed implied-in-fact contract. As with the lack of clarity as to the scope of the agreement, the extent to which Mr. Trachtenberg had *committed* to transfer Silk Title's deposits over to Fifth Third is uncertain, and his own deposition testimony and Silk Title's responses to Fifth Third's Interrogatories declined to specify any dollar amount that Silk Title was bound to transfer in exchange for the Challenged Payments. *See* Fifth Third, Supporting Attachments to ECF No. 111, at Footnote 16. In response, Silk Title states, in conclusory fashion, that it "did not reserve any unfettered discretion" and, confusingly, that "[t]he promise in exchange for the promise to pay incentives was not such that Silk would move its entire banking relationship from Wells Fargo over to Fifth Third, but Silk reserved the unfettered discretion to curtail the transport of its banking relationship at any time." (ECF No. 106 at 25.) Silk Title points to no evidence in the record that would support either of these statements, despite it being the party that bears the burden of proof as to the existence of the contract. *See Fogarty*, 163 A.3d at 541.

Given the above, the Court concludes that, even with the evidence construed in the light most favorable to Silk Title, no implied-in-fact contract existed between it and Fifth Third regarding the Challenged Payments. Absent such a contract, the

parties' arguments as to Mr. Chapman's implied or apparent authority—dubious as that authority may have been—are necessarily moot. Silk Title's Motion for Partial Summary Judgment must therefore be denied.

The remaining question is whether Fifth Third is entitled to summary judgment against Silk Title's claims and in favor of its own counterclaims. With respect to Silk Title's claims, Counts I and II (breach of contract and breach of implied-in-fact contract) must fail given its failure to establish the existence of the alleged contract. Count III (promissory estoppel) fails for a similar reason: under Rhode Island law, promissory estoppel requires among other things a "clear and unambiguous promise" by the party to be estopped (here, Fifth Third), *see Cote*, 148 A.3d at 547, which is lacking here. Similarly, to prevail on Count IV (negligent misrepresentation), Silk Title would have to demonstrate its reliance on "a misrepresentation of a material fact." *Id.* at 549 (quoting *Zarrella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1257 (R.I. 2003)). But to the extent that Silk Title alleges that Fifth Third, through Mr. Chapman, misrepresented its agreement to provide the Challenged Payments, that would not be a *factual* misrepresentation because "[f]uture events or promises are not considered factual." *Id.* As such, summary judgment must enter on Silk Title's claim under Count IV as well.

As for Fifth Third's counterclaims, Count I alleges breach of note based on Silk Title's failure to pay its $1 million line of credit, Count II alleges failure to pay past due credit card debt, Counts III through IX assert claims for breach of guaranty against Silk Title's various guarantor LLCs, Count X alleges breach of security

agreement based on Silk Title's defaults, Count XI alleges unjust enrichment based on the $500,000 Challenged Payment, and Count XII alleges failure to pay overdraft fees. (ECF No. 19 ¶¶ 44–86.) Fifth Third's Motion for Summary Judgment sets forth the grounds on which it argues it is entitled to judgment as a matter of law on all counts. (ECF No. 100 at 47–54.) Apart from its dispute over the existence of the supposed implied-in-fact contract, Silk Title's response to Fifth Third's Motion for Summary Judgment offers no objections to Fifth Third's counterclaims, and—notwithstanding its reference to "several erroneous debits" that it alleges have not yet been rectified—it does not challenge any material facts underpinning those counterclaims. *See* ECF No. 107 at 42–46. As such, Fifth Third's arguments for summary judgment on its counterclaims are effectively unopposed, and it is therefore entitled to judgment in its favor.

## IV. CONCLUSION

For these reasons, the Court DENIES Silk Title's Motion for Partial Summary Judgment (ECF No. 98) and GRANTS Fifth Third's Motion for Summary Judgment (ECF No. 100).

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

September 29, 2026